# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

LAURA COUCH,
    Plaintiff

vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:11-cv-174
Spiegel, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for disability insurance benefits (DIB). This matter is before the Court on plaintiff's Statement

of Errors (Doc. 7), the Commissioner's response in opposition (Doc. 12), and plaintiff's reply

memorandum. (Doc. 17).

## I. Procedural Background

Plaintiff filed an application for DIB on March 1, 2004, alleging disability since July 16,

1996, due to migraine headaches. Plaintiff's application was ultimately denied by

Administrative Law Judge (ALJ) Ronald Jordan. Plaintiff subsequently filed a civil suit and

District Judge Beckwith, adopting the Report and Recommendation of Magistrate Judge Hogan,

reversed ALJ Jordan's disability determination. (Tr. 627-47); *see Couch v. Comm'r of Soc. Sec.*,

No. 1:08cv300, 2009 WL 361092 (S.D. Ohio Feb. 9, 2009) (*Couch I*). Judge Beckwith held that

ALJ Jordan's finding that plaintiff was not credible was not substantially supported and that

plaintiff was disabled for the closed period of July 1, 1996 through December 31, 1997; the case

was remanded to the Commissioner for a determination as to whether plaintiff was entitled to benefits after December 31, 1997. *Id.*

On remand, plaintiff, through counsel, appeared at a hearing before ALJ Deborah Smith. Plaintiff and a vocational expert (VE) testified at the ALJ hearing. On November 16, 2009, the ALJ issued a decision finding plaintiff's disability ended as of January 1, 1998, and that as of that date through her date last insured plaintiff was not disabled. Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

**II. Medical Evidence**

The record includes plaintiff's treatment records for headaches from 1992 to 2006. For the sake of brevity, the Court incorporates by reference the medical summary from *Couch I* of plaintiff's treatment from July 1992 to November 1998 which details plaintiff's treatment for headaches with several physicians, including Vivay R. Rajan, M.D., Kathy Alter, M.D., Vincent Martin, M.D., and Robert Smith, M.D. *See* Tr. 634-39. The following is a summary of plaintiff's treatment from November 1998 to February 2006.

Plaintiff treated with Dr. Alter[1] from November 1998 to January 2006. (Tr. 119-33; 374-79 ). In November 1998, Dr. Alter noted plaintiff's mood had improved though plaintiff reported an increase in headaches. (Tr. 119). January 1999 notes indicate that plaintiff was feeling better and her prescription for Ativan was continued. *Id.* June 14, 1999 notes show that plaintiff complained of migraine headaches and reported that her medications were not helping.

---

[1] Dr. Alter is plaintiff's family practitioner. (Tr. 946).

(Tr. 120). On March 6, 2000, plaintiff was seen for a sinus infection, congestion, and cough. (Tr. 120). The treatment notes indicate that plaintiff was five months pregnant at this time. *Id.* In February and October 2001, plaintiff reported ongoing "terrible" migraine headaches. (Tr. 121). The November 6, 2001 treatment notes show that plaintiff was hospitalized for migraines and had been incapacitated by migraine pain for one week. (Tr. 122). Plaintiff was assessed with migraines, Crohn's disease, and bronchitis. *Id.* Plaintiff continued to complain of chronic migraine pain in January and February 2002 and expressed a desire to find a cause for the migraines; the February 2002 notes include a notation that plaintiff "prays to die young." (Tr. 124-25). Plaintiff reported migraine pain in April 2002 and in September 2002 that she was attempting to treat her headaches with acupuncture twice weekly. (Tr. 126, 127). In November 2002, plaintiff reported she was still receiving acupuncture for her migraines and Dr. Alter started her on Topomax. (Tr. 130). At a January 2003 follow-up, plaintiff reported that the Topomax was prophylactically effective 90% of the time but that she still had migraine headaches that could last for 10 to 15 days, though she did state that the headaches were occurring less frequently, once a month, as opposed to the previous four to five times a week. (Tr. 131). However, on January 27, 2003, plaintiff reported that her migraine headaches had recently gotten worse. (Tr. 132). Plaintiff stated that the Topomax had briefly helped, but her headaches had increased and she reported going to the emergency room recently. *Id.* February 2003 notes indicate that plaintiff had been having severe migraine headaches, that medications were not helping, and that she was diagnosed as having chronic intractable headaches. (Tr.

3

133).[2] Treatment notes from January 2004 to January 2005 demonstrate that plaintiff was experiencing ongoing migraines, working with other physicians to address and control the symptoms, being treated at a pain clinic, and getting massage and acupuncture therapy. (Tr. 374-79). In January 2006, plaintiff reported having four migraine headaches per week. (Tr. 377).

Plaintiff treated with Claude Hobeika, M.D., the Director of the Balance Disorder Institute from April 17, 2001 to October 16, 2001. (Tr. 491-519). At her initial intake evaluation, plaintiff reported a long history of headaches associated with dizziness and lightheadedness. (Tr. 498). Plaintiff recounted her prior treatment and medications and reported that 90% of her headaches can be controlled with Maxalt but that she will frequently develop another headache the same day or the next morning. *Id*. A physical examination of plaintiff yielded normal findings. *Id*. Dr. Hobeika diagnosed daily headache, migraine headache, Crohn's disease, anxiety, and compulsiveness. (Tr. 498-99). Dr. Hobeika advised plaintiff to go on a tyramine-free diet and prescribed Clonazepam and Amitriptyline. (Tr. 499).

At the May 1, 2001 follow-up, plaintiff reported she had experienced one severe and several smaller headaches since her initial April 17, 2001 visit. (Tr. 505-06). Plaintiff was taking less pain medication, which she noted was a major improvement, and she had followed the diet as best she could. *Id*. On July 12, 2001, plaintiff reported a decrease in frequency of headaches but noted that the headaches seemed to last longer. (Tr. 507). She stated that Maxalt was not as effective as before and that it takes two hours for the drug to work but she still carries

---

[2] Dr. Alter's treatment notes are entirely handwritten. Accordingly, it is impossible to decipher portions of the notes which may or may not address plaintiff's headaches.

the headache all day. *Id.* Dr. Hobeika noted the improvement, increased her prescriptions for Amitriptyline and Clonazepam and suggested taking Fioricet before taking Maxalt. *Id.* On July 23, 2001, plaintiff called for medication advice due to ongoing headaches and she was advised to increase her dosage of Fioricet. (Tr. 509). At a September 2001 follow up, plaintiff reported an exacerbation of her Crohn's disease and that the Fioricet was only working intermittently so she was supplementing with Motrin. (Tr. 510). At the time of the visit plaintiff was experiencing her most severe headache in eight months, since beginning Zoloft. *Id.* Dr. Hobeika continued her medications, advised her to mix Fioricet with half a Clonazepam, and gave her Zomig to treat the current headache. *Id.* On October 5, 2001, plaintiff reported that she had stopped taking Clonazepam but started again due to headaches. (Tr. 516). She reported that her recent headaches were "flooring" her, the Maxalt was no longer helping, and the Zomig did not help her previous headache. *Id.* Dr. Hobeika assessed persistent migraine but did not rule out rebound headache, noting that headaches occur twice daily and a few hours after she takes Maxalt. *Id.* Plaintiff was advised to go home, take Tylenol #3 and sleep and, if that failed, go to emergency room to receive Demerol with Phenergan or Vistaril. *Id.*

On October 6, 2001, plaintiff visited a hospital emergency room complaining of migraine headache pain. Plaintiff reported having pain for ten days prior to coming to the hospital which were not responding to her medications. Plaintiff stated that she came to the emergency room on the advice of Dr. Hobeika due to the inefficacy of her prescribed medication. Physical examination revealed that plaintiff was in "moderate distress at rest secondary to her headache." Plaintiff was diagnosed with migraine headache and treated with intramuscular Demerol and

5

Phenergan which minimally relieved her headache. She was then treated with intravenous Compazine which fully resolved the headache. (Tr. 136-37).

Plaintiff called Dr. Hobeika on October 9, 2001 reporting a headache that was not responding to medications. (Tr. 514). After plaintiff described a recent string of intractable headaches, Dr. Hobeika advised plaintiff to take another Clonazepam and go to bed. *Id.* Plaintiff's last treatment note from Dr. Hobeika is dated October 15, 2001. (Tr. 517-18). Plaintiff reported the October 6, 2001visit to the hospital and stated that her most recent headache was the previous night. (Tr. 517). She stated that the only medication that had helped with the pain was Maxalt. *Id.* Dr. Hobeika advised plaintiff to continue Amitriptyline, increase Zoloft, use Fiorinal with oral Phenergan or Clonazepam, and try Fiorinal with the Maxalt. *Id.*

On October 22, 2001, plaintiff was admitted to the hospital complaining of daily, severe, migrainous headaches which started after receiving Remicade for her Crohn's disease. Plaintiff reported that she was treated by Dr. Hobeika and that she had been on multiple prescriptions for migraines, including Fioricet, Imitrex, Flexeril, Tylenol #3, Vicodin, Atenolol, Zomig, and Maxalt. Plaintiff was diagnosed with intractable migraines and Crohn's disease and given her usual medications, along with 50 mg. of Amitriptyline, 5 mg. of intravenous Reglan, and Dihydroergotamine (DHE). Plaintiff's blood work was normal. Plaintiff was seen by Dr. Rajan, a neurologist who had treated her previously, and he opined that Depakote should be considered for a prophylaxis. Plaintiff reported to Dr. Rajan that her headache pain was throbbing in nature, worse with bright light or loud noise, and that sleeping in a quiet dark room eases the pain. Plaintiff also reported accompanying nausea and occasional scintillating scotoma. The following

6

day, plaintiff was treated with eight doses of DHE and she reported at least a 50% decrease in headache pain. Plaintiff was discharged after receiving 500 mg. of Depakote intravenously and was in stable condition. Dr. Alter was her admitting and treating physician; Dr. Rajan and Dr. Kim Jurell were consulting physicians. (Tr. 139-54).

Plaintiff was treated at the Alliance Institute for Integrative Medicine (AIIM) from March 2002 to February 2006. (Tr. 156-328; 411-56). Plaintiff began treatment at AIIM pursuant to a referral by Dr. Alter. Plaintiff treated with James Leonard, M.D, an acupuncturist. On March 27, 2002, Dr. Leonard reported that plaintiff had been lately experiencing an increase in the severity of her migraine headaches. (Tr. 156). Plaintiff reported that 95% of her headaches are migraines that resolve within two hours when treated aggressively with medication, but if treated with narcotics, or not treated early enough, the headache can last the entire day. *Id.* Plaintiff treated at AIIM for migraines 61 times between March 27, 2002 and February 20, 2006.[3]

On January 24, 2003, plaintiff was treated at the hospital and reported an ongoing migraine headache that had lasted 11 days. Plaintiff stated that she was usually able to control her headaches at home with medication but that this headache was more severe. Plaintiff reported associated nausea and photophobia. A physical examination of plaintiff yielded normal results. Plaintiff was diagnosed with migraine cephalgia and given Reglan, Toradol, Phenergen and fluids. Plaintiff reported feeling better after receiving medications, but also that the

---

[3] Plaintiff treated at AIIM a total of 79 times during this period but on six of these visits migraines were not noted as a basis for treatment. *See* Tr. 284, 287, 308, 315, 318, 325, 421, 425, 427, 429, 431, 433, 435, 437, 439, 441, 443, 445, 447, 449, 451, 453, 455. *See also* Tr. 448 (while September 8, 2005 treatment notes did not list headache as primary reason for treatment, Tr. 447, plaintiff reported that it was the first day of the week she had not had a migraine headache).

7

headache persisted and was noticeable when she moved her head. Plaintiff was given additional Demerol and Phenergan. The prescribing doctor noted that he felt the additional medicine was likely not necessary as plaintiff was feeling much better after the initial doses, but he found plaintiff's complaints of discomfort to be very reasonable. Plaintiff was discharged in good condition, given additional Phenergan pills for nausea treatment, and advised to rest in a dark room. (Tr. 333-41).

Plaintiff was referred to Lisa K. Mannix, M.D., by Dr. Leonard for headache evaluation. Dr. Mannix evaluated plaintiff on February 24, 2003 and plaintiff reported having migraine headaches for as long as she could remember. Plaintiff explained that she experienced headaches four days a week, but that the headaches had worsened gradually over the past two and one-half years and she was "desperate" for relief. Plaintiff described three levels of severity of headaches with the most severe headache occurring two to three times per week, while less severe migraines occurred once or twice weekly. During the most severe headaches, plaintiff described hysterical crying and wishing to die, while with less severe headaches she lays still. A severe headache can build out of less severe headaches and on average they last 48 hours. Plaintiff reported associated nausea, some vomiting, photophobia and phonophobia, and stated that she generally treats severe headaches with Phenergan and sleep. (Tr. 343).

Plaintiff stated that she was currently prescribed Topamax, Effexor, Wellbutrin, Ativan, Triptan, Fioricet, Phenergan, and vitamin supplements; previously she had been prescribed Reglan, Toradol, Sonata, Zoloft, Paxil, Pamelor, Amitriptyline, Celexa, Depakote, Klonopin, Ambien, Valium, propranolol, atenolol, verpamil, lidocaine nose drops, intravenous and nasal

8

spray DHE, and a variety of pain medications and anti-inflammatories. *Id.* Plaintiff reported that her headaches interfered with her daily activities as she used to walk ten miles a week but the exercise increases her pain and she has withdrawn from social and recreational activities, such as volunteering, school projects, and church. *Id.* Dr. Mannix diagnosed plaintiff with chronic daily headaches and migraine without aura, and opined that the lack of treatment response is due to medication overuse, increased physical or emotional stress, and the natural waxing and waning pattern of the disease. (Tr. 344). Dr. Mannix further opined that additional neuroimaging studies are not necessary and recommended that plaintiff keep a headache diary to isolate potential triggers. (Tr. 345). Dr. Mannix advised plaintiff to continue her acupuncture and massage treatment at AIIM and her counseling with Dr. Leonard, but recommended that she discontinue trigger point injections if they appear to worsen her headaches. *Id.* Plaintiff was further advised to manage and change her medications slowly over time to avoid agitating her headache condition and that she may possibly benefit from Botox injections or muscle relaxers. *Id.* Dr. Mannix noted that sleep was the best therapeutic option for plaintiff and recommended continued use of Phenergan to aid in inducing sleep. *Id.*

Plaintiff continued to treat with Dr. Mannix until April 2004. Treatment notes demonstrate that Dr. Mannix worked with plaintiff to manage her medications and address side effects (Tr. 347-48, 349, 352, 355, 357-58, 366-67), to ensure that she was following up with counselors for associated depression (Tr. 346, 348), and to treat plaintiff with Botox injections for headache pain. (Tr. 350, 353, 356, 361, 364). Plaintiff reported some relief from the Botox initially, but noted that it was temporary and her migraines returned after the effects of the Botox

9

waned; ultimately, plaintiff reported that her final March 29, 2004 Botox injection provided no relief at all. (Tr. 351, 362, 364). Plaintiff ceased treatment with Dr. Mannix in November 2004 when she transferred her pain management treatment to the Pain Clinic in Dayton. (Tr. 460).

On April 12, 2004, Geraldine Wu, M.D., completed a diagnostic form at the request of the Social Security Administration. Dr. Wu had evaluated plaintiff on April 17, 2003 pursuant to a referral from a neurologist. Dr. Wu diagnosed plaintiff with recurrent major depression, migraine headaches, and Crohn's disease. Dr. Wu opined that plaintiff had ongoing depression symptoms that increased with her headache frequency and noted that plaintiff's treatment involved continuing prescription medications. Plaintiff was described as having good responses to prescription treatment for her depressive symptoms, but that treatment was compromised by plaintiff's migraine headaches. Dr. Wu opined that plaintiff has major recurrent headaches, she is intolerant to headache medications, she is depressed due to her uncontrolled headaches, and she has Crohn's disease. (Tr. 369-71).

Plaintiff was treated by Suresh Gupta, M.D., at the Pain Clinic at Dayton ("Pain Clinic") from June 2004 to February 2006. (Tr. 381-410; 458-73). At her initial evaluation, plaintiff reported an increase in headache frequency after the birth of her last child and stated she had been taking medications and treating with acupuncture, massage, and a chiropractor. (Tr. 381). Dr. Gupta diagnosed plaintiff with chronic migraine and muscle tension headaches and fibromyalgia and recommended a Duragesic patch for pain. (Tr. 382). On July 2, 2004, plaintiff reported breakthrough pain when her patch was being changed and noted that stress and activity increased her pain. (Tr. 383). Plaintiff reported a 100% decrease in pain with the Duragesic patch. *Id.* At the July 30, 2004 follow-up, plaintiff continued to report a 100% decrease in pain but also reported fatigue due to the patch and stated that she takes four to five naps a day on the medication; consequently, Dr. Gupta decreased the Duragesic precription. (Tr.

384). In August 2004, plaintiff continued to report a decrease in headache pain, but reported that she had experienced more migraines this month than previously. (Tr. 385). Dr. Gupta noted that the decreased dose of Duragesic had not decreased her fatigue but that there was an increase in headache pain and he increased the prescription to the original higher dose. *Id.* In September 2004, plaintiff reported numbness in her left hand and she was advised to return in a week for trigger point injections (TPIs). (Tr. 386). Plaintiff returned and on October 8, 2004, she received TPIs and reported ongoing fatigue due to the Duragesic patches. (Tr. 387). Dr. Gupta modified plaintiff's medication by taking her off the patches, prescribing methadone for pain, and switching her prescription from Zanaflex to Skelaxin to address drowsiness. *Id.* Treatment notes from November 2004 to December 2004 show that plaintiff was continuing to experience lethargy due to medications and Dr. Gupta stopped methadone and returned plaintiff to Duragesic patches; also, plaintiff reported increased anxiety and panic attack after she was taken off Ativan to reduce fatigue. (Tr. 389-93).

On January 6, 2005, plaintiff underwent a physical examination and was noted as having difficulty handling weights due to pain in multiple areas and with activities that require reaching. (Tr. 394-96). The next day, plaintiff had a follow-up visit and reported less fatigue but an increase in headaches. (Tr. 397). On January 28, 2005, plaintiff reported ongoing fatigue and daily migraine headaches. (Tr. 399). In March 2005, plaintiff reported an increase in headaches and informed Dr. Gupta that the increase may be related to the mal-alignment of her temporomandibular joint. (Tr. 400). To address the increase in headaches, Dr. Gupta re-prescribed Topamax at a low dose. *Id.* Pursuant to plaintiff's complaints of neck pain, Dr. Gupta ordered an MRI which showed noncompressive spondylitic protrusion at C4-C5. (Tr. 402). At the April 5, 2005 follow-up visit, plaintiff reported a decrease in headaches. (Tr. 403). Plaintiff returned to Dr. Gupta on April 13, 2005 to address a headache that started due to increased neck pain. (Tr. 404). Plaintiff reported some associated nausea and she was prescribed

11

Lidoderm patches and given intramuscular injections of Toradol, Norflex, and Phenergan. *Id.* May 2005 treatment notes indicate that plaintiff did not receive any relief from the April 13, 2005 injections and that her pain has increased in the past month and was higher than before she began treating at the Pain Clinic. (Tr. 405). Plaintiff reported that her headaches are becoming more frequent and nothing seems to help and she cancelled all appointments for the month anticipating that she would be incapacitated by the pain. *Id.* Plaintiff stated that Vicodin helps with the headaches if she takes it fast enough. *Id.* Dr. Cara Perez scheduled her for a series of trigger point injections six weeks out. *Id.* Plaintiff returned on May 27, 2005 and was treated by Dr. Gupta. (Tr. 407). Plaintiff reported a decrease in neck pain after physical therapy and stated that she was tolerating her medications well. (Tr. 408). On June 28, 2005, plaintiff reported concern about experiencing migraine headaches due to an upcoming trip to Mexico. (Tr. 409). Dr. Perez increased plaintiff's Topamax prescription and provided her extra Vicodin to control headaches. *Id.*

July 2005 treatment notes indicate that plaintiff was having an increase in headaches and she received an intramuscular injection of Toradol and her Topamax prescription was increased. (Tr. 462-63). On August 30, 2005, plaintiff reported a decrease in headache but an increase in overall pain. (Tr. 464). In September 2005 plaintiff reported that her pain was better controlled and she reported no headache. (Tr. 467). In November 2005 plaintiff reported headache but the treatment notes do not address the severity or length of the headache. (Tr. 469). The final treatment notes from the Pain Clinic are from February 21, 2006, at which time plaintiff reported a decrease in overall pain and no headache was noted. (Tr. 471).

The record also includes copies of receipts and lists of plaintiff's various prescriptions from 2000 to 2009, including, but not limited to, Oxycodone, Phenergan, Amitriptyline, Depakote, Imitrex, Duragesic patches, Topamax, and Lorazepam. (Tr. 719-838).

12

## III. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Where, as here, the plaintiff challenges the cessation of disability benefits, the central issue is whether plaintiff's medical impairments have improved to the point where she is able to perform substantial gainful activity. 42 U.S.C. § 423(f)(1). *See Kennedy v. Astrue*, 247 F. App'x 761, 764 (6th Cir. 2007). Medical improvement is any decrease in the medical severity of an impairment and is calculated from "the most recent favorable decision" finding the recipient disabled. 20 C.F.R. § 404.1594(b)(1). "[A] medical improvement is related to an individual's ability to work only 'if there has been a decrease in the severity . . . of the impairment(s) present at the time of the most recent favorable medical decision and an increase in [the individual's] functional capacity to do basic work activities[.]'" *Id.* at 765 (quoting 20 C.F.R. § 404.1594(b)(2) and citing *Nierzwick v. Comm'r of Soc. Sec.*, 7 F. App'x 358 (6th Cir. 2001)). There is no presumption of continuing disability. *Cutlip v. Sec'y of H.H.S.*, 25 F.3d 284, 286-87 n.1 (6th Cir. 1994).

13

In determining whether a recipient's entitlement to disability benefits has ended, the

Commissioner uses an eight-step sequential evaluation process:

> (1) Is the recipient engaging in substantial gainful activity? If so, the recipient's disability will have ended;

> (2) If the recipient is not working, do his impairments meet or equal a listed impairment? If so, his disability will be continued;

> (3) If the recipient's impairments do not meet or equal a listed impairment, has there been any medical improvement in his impairments? If so, the analysis proceeds to step four; if not, it proceeds to step five;

> (4) If there has been medical improvement, is it related to the recipient's ability to do work? If so, the analysis proceeds to step six, if not, it proceeds to step five;

> (5) If there is no medical improvement, or if the improvement is unrelated to the recipient's ability to do work, does one of the exceptions to medical improvement apply? If not, the disability has continued; if so, the disability is ended;

> (6) If medical improvement is related to the ability to do work, are the recipient's current impairments severe in combination? If not, the disability is deemed to have ended; if so, the analysis proceeds to step seven;

> (7) If the recipient's impairments are severe, the Commissioner will assess his residual functional capacity and consider whether he can do his past work. If so, he will be found no longer disabled;

> (8) If the recipient cannot do his past work, the Commissioner will consider whether the recipient can do other work given his residual functional capacity, age, education, and experience. If so, the disability will be found to have ended.

*See* 20 C.F.R. § 404.1594(f)(1)-(8); *see also Johnson v. Sec'y of H.H.S.*, 948 F.2d 989, 991 (6th

Cir. 1991).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

1. The claimant met the insured status of the Social Security Act through September 30, 2000.

2. The most recent favorable medical decision finding that the claimant was disabled is the decision dated February 9, 2009. This is known as the "comparison point decision" or CPD.

3. At the time of the CPD, it was found that the claimant had the following medically determinable impairment as of July 1, 1996: headache. This impairment was found to have caused the claimant to be unable to persist at work like tasks for the full course of an eight hour day or five-day work week.

4. Through December 31, 1997, the date the claimant's disability ended, the claimant did not engage in substantial gainful activity (20 C.F.R. § 404.1594(f)(1)).

5. The medical evidence establishes that the claimant did not develop any additional impairments after July 1, 1996, through December 31, 1997. Thus, the claimant continued to have the same impairment after December 31, 1997, that she previously had as determined in the CPD.

6. After December 31, 1997, the claimant did not have an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525 and 404.1526).

7. Medical improvement occurred as of January 1, 1998 (20 C.F.R. § 404.1594(b)(1)).

8. After careful consideration of the entire record, the [ALJ] finds that, after December 31, 1997, and continuing until September 30, 2000, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except that she was not able to work in direct sunlight or in an environment of strong odors or excessive dust, fumes, or gases. She was able to perform only simple, routine, repetitive work without strict production requirements. The claimant also could not work around heights, hazards, or dangerous equipment.

9. The claimant's medical improvement is related to the ability to work because it resulted in an increase in the claimant's residual functional capacity (20 C.F.R. § 404.1594(c)(3)(ii)).

10. As of January 1, 1998, the claimant's impairment continued to be severe (20 C.F.R. § 404.1594(f)(6)).

11. Through the date last insured, despite her medical improvement, the claimant was unable to perform any past relevant work (20 C.F.R. § 404.1565).

12. The claimant . . . was 33 years old, which is defined as a younger individual age 18-49, on September 30, 2000, the date last insured (20 C.F.R. § 404.1563).

13. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

14. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant was "not disabled" as of January 1, 1998, whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

15. From January 1, 1998, through the last date insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. §§ 404.1569 and 404.1569(a)).

16. The claimant's disability ended as of January 1, 1998 (20 C.F.R. § 404.1594(f)(8)).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229

(1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a

preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In

deciding whether the Commissioner's findings are supported by substantial evidence, the Court

considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the

disability determination. Even if substantial evidence supports the ALJ's conclusion that the

plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails

to follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).

*See also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545–46 (6th Cir. 2004) (reversal required

even though ALJ' s decision was otherwise supported by substantial evidence where ALJ failed

to give good reasons for not giving weight to treating physician's opinion, thereby violating the

agency's own regulations).

### D. Specific Errors

On appeal, plaintiff argues that: (1) the ALJ erred in finding that plaintiff experienced a

medical improvement as of January 1, 1998; and (2) the ALJ erred in determining plaintiff's

credibility.

1. The ALJ's determination that plaintiff experienced a medical improvement is without substantial support in the record.

The ALJ determined that plaintiff experienced a medical improvement as of January 1, 1998, the day after the closed period for which plaintiff was granted disability benefits. The ALJ also found that plaintiff was not disabled as of January 1, 1998 through September 30, 2000, plaintiff's date last insured. In support of these findings, the ALJ cited to a lack of supporting medical evidence between December 1997 and September 2000, when plaintiff's insured status lapsed.

First, the ALJ noted "no records of medical treatment from December 1997 through November 1998 . . . ." (Tr. 621). The ALJ concluded that plaintiff "apparently did not require any medical attention, at least any that has been documented, for at least 11 months." (Tr. 622). The ALJ determined that the absence of medical evidence during this time period indicated that plaintiff "clearly had medical improvement after December 1997 such that whatever headaches she was having did not necessitate anything other than very occasional medical attention and generally allowed her to perform her normal functions of daily living." *Id*.

Second, the ALJ reviewed the medical records from November 1998 to September 2000 and concluded that plaintiff complained of headaches only twice: plaintiff complained of an increase in headaches in November 1998; January 1999 treatment notes did not mention headaches; June 1999 notes demonstrated that plaintiff was experiencing migraines which were unresponsive to medication; March 2000 notes did not address headaches; and February 2001 documented plaintiff's reports of experiencing "terrible" migraines. *Id*. (citing Tr. 119-21).

Third, the ALJ noted that while plaintiff submitted additional medical evidence post-dating September 30, 2000, her date last insured, none of these records illuminated plaintiff's functioning or headache impairment for the relevant time period. The ALJ cited plaintiff's reports during her 2003 emergency room visit that she was generally able to control her headaches at home with medication. The ALJ also determined that references to plaintiff's headache history contained in later records did not provide any information concerning what, if any, limitations plaintiff's impairment caused her between December 1997 and September 2000 when her insured status lapsed. *Id.* (citing Tr. 334).

Plaintiff asserts that the ALJ's reliance on the lack of medical records during the relevant time period to find medical improvement is erroneous as there was no evidence that plaintiff's condition had actually improved. Plaintiff's argument is well-taken.

The burden of proof in establishing a medical improvement lies with the Commissioner. *Nierzwick*, 7 F. App'x at 361 (citing *Griego v. Sullivan*, 940 F.2d 942, 944 (5th Cir. 1991)). For the ALJ's finding to be affirmed, there must be substantial evidence showing that plaintiff experienced a medical improvement such that she would be able to engage in substantial gainful activity.

In the instant case, the ALJ's exclusive reliance on plaintiff's lack of documented treatment for the initial eleven month period (January to November 1998) in determining that plaintiff's impairment had improved ignores plaintiff's testimony -- testimony specifically elicited by the ALJ's questions at the hearing -- regarding the reason for the lack of records for this time period. When asked why there were no treatment records for that time period, plaintiff

19

testified that for at least a portion of this eleven months she was pregnant with her second child and did not seek treatment for her headaches as her pregnancy precluded her ability to take pain medication.[4] (*See* Tr. 960-961). In addition, the evidence of record demonstrates that for at least another nine month period (from approximately November 1999 to July 2000) plaintiff was pregnant with her third child.[5] As detailed in the recitation of plaintiff's medical evidence listed above, the vast majority of plaintiff's medical treatment for her migraine headaches consists of receiving a variety of pain medications. Accordingly, plaintiff's lack of medical treatment for these two nine month periods was explained by her pregnancies.

The ALJ failed to address plaintiff's explanation for the lack of migraine treatment for the relevant time period. Social Security Ruling 96-7p states that "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."[6] The ALJ specifically asked plaintiff about

---

[4] The record includes progress notes from plaintiff's treating physician advising her to stop her migraine medications in preparation for her first pregnancy. (Tr. 114-115). The plan was to slowly taper her off of her migraine medications. *Id.* This evidence supports plaintiff's testimony that she was precluded from taking migraine medication for her subsequent pregnancies.

[5] The records show plaintiff was pregnant with her third child from approximately November 1999 to July 2000. A March 2000 note from Dr. Alter shows plaintiff was five months pregnant (Tr. 120) and an August 2000 note from Dr. Jurell shows that plaintiff had delivered her third child one month ago. (Tr. 573). The record of plaintiff's prescription medications further supports this conclusion as plaintiff was not taking any migraine medication in June 2000, but began taking pain medications for migraine treatment July 13, 2000. *See* Tr. 719 (in June 2000 plaintiff was prescribed Metoclopramide, a heartburn medication; in July 2000 plaintiff began taking Oxycodone/APAP, a generic form of Percocet).

[6] "Social Security Rulings do not have the force and effect of law, but are 'binding on all components of

the lack of medical treatment (Tr. 960), but then ignored plaintiff's testimony about her inability

to take migraine pain medication during her pregnancy in contravention of SSR 96-7p. As a

result, the ALJ improperly inferred that plaintiff was medically improved due to a lack of

treatment between December 1997 and November 1998 (the initial 11 month period) and

thereafter. Despite the evidence of record substantiating plaintiff's explanation that she could

not continue her migraine treatment during pregnancy, the ALJ determined that plaintiff had

experienced a medical improvement because she did not regularly seek treatment for her

migraine headaches from December 1997 to November 1998. Given plaintiff's supported and

reasonable explanation for not seeking regular migraine treatment during this time, the ALJ erred

by finding that this gap in treatment constituted a "medical improvement" without properly

considering plaintiff's explanation as required by SSR 96-7p.

Though the Commissioner argues that the ALJ may rely on the lack of treatment for this

time period in finding that plaintiff was medically improved, he cites to no authority supporting

this position. Further, this argument fails to address the ALJ's dereliction of her duty to not draw

improper inferences from a lack of treatment without considering plaintiff's supported and

reasonable explanation. Nor does the ALJ cite to any medical evidence that plaintiff's symptoms

improved or signs or laboratory findings supporting her finding of medical improvement. *See* 20

C.F.R. 404.1594(b)(1). *See also Wahwassuck v. Astrue*, No. 07-0073, 2008 WL 818262, at \*4-5

the Social Security Administration' and represent 'precedent final opinions and orders and statements of policy and interpretations' adopted by the Commissioner. 20 C.F.R. § 402.35(b)(1). In *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 549 (6th Cir. 2001), the court refrained from ruling on whether Social Security Rulings are binding on the Commissioner in the same was as Social Security Regulations, but *assumed* that they are. [The Court] makes the same assumption in this case." *Ferguson v. Comm'r of Soc. Sec.*, 627 F.3d 269, 272 n.1 (6th Cir. 2010) (emphasis in original).

21

(D. Idaho Mar. 24, 2008) (holding that the "medical improvement standard *requires that there be medical evidence demonstrating an improvement* in symptoms, signs or laboratory findings" and reversing ALJ's finding of medical improvement based on lack of treatment where there was a valid reason for not taking pain medications ) (emphasis added); *Rice v. Chater*, 86 F.3d 1, 2 (1st Cir. 1996) (finding that plaintiff's lack of treatment was not evidence of medical improvement and holding that "changed symptoms, signs and laboratory findings are the only relevant indicia of medical improvement under the regulations.") (citing 20 C.F.R. § 404.1594(b)(1) & (7), (f)(3)). *Cf. Webber v. Astrue*, No. 3:09CV0745, 2011 WL 1740174, at *8 (D. Conn. Apr. 7, 2011) (Report and Recommendation), *adopted*, 2011 WL 1739991 (D. Conn. May 5, 2011) (affirming ALJ's finding of medical improvement where plaintiff with cardiac condition presented no evidence of treatment for 17 years, plaintiff's doctor noted that he did not understand why his patient was on disability, and plaintiff testified that his heart condition seemed to be okay). Upon a review of the record as a whole, the undersigned concludes that the ALJ's finding of medical improvement based on plaintiff's temporary cessation of treatment is not supported by substantial evidence. *See Campbell v. Comm'r of Soc. Sec.*, No. 10-13098, 2011 WL 2160460, at *5 (E.D. Mich. June 1, 2011) (plaintiff who temporarily stopped taking medication for secondary reason did not experience medical improvement).

Plaintiff's extensive treatment for and complaints of migraine headaches are thoroughly documented for the periods both before and after the eleven-month period, further undermining the ALJ's finding of a medical improvement. Moreover, plaintiff did complain of headaches during times she was not actively being treated and/or medicated. *See* Tr. 119-121 (plaintiff

22

complained of increased headaches in November 1998 and reported intractable migraines in June 1999). Likewise, the ALJ's finding that plaintiff was able to perform her normal daily living activities despite any headaches she experienced from January 1998 to September 2000 is unsupported by any evidence and contradicted by plaintiff's testimony that she continued to experience headaches of a frequency and severity consistent with those which were previously determined to be disabling (Tr. 959) and that the longest period of relief she experienced from headaches was one week. (Tr. 954-55).

Lastly, the Commissioner argues that plaintiff's statements that she is able to control her headaches with medication supports the ALJ's finding that plaintiff is medically improved. In her decision, the ALJ briefly noted instances in the record where plaintiff reported that she was able to control her headaches with medication. (Tr. 623). The Commissioner cites to *Conner v. Astrue*, No. 3:07-872, 2010 WL 455261, at *5 (M.D. Tenn. Feb. 1, 2010) in support of the proposition that plaintiff's statements demonstrate that she is not disabled as her condition is remediable through medication. This argument is flawed as both the record and plaintiff's ongoing medical treatment clearly demonstrate that while she is generally able to avoid going to the emergency room, her headaches are consistent and incapacitating despite the use of a wide variety of medications and treatment. Further, the ALJ referred to these statements in making her credibility determination and did not rely on them in finding that plaintiff experienced a medical improvement.

In light of the evidence of record and the requirements of Social Security Ruling 96-7p, the ALJ erred in finding that plaintiff experienced a medical improvement as of January 1, 1998.

23

## 2. The ALJ's credibility determination is not substantially supported.

It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 247 (6th Cir. 2007) (citations omitted). In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *Kirk,* 667 F.2d at 538. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

The ALJ's credibility decision must also include consideration of the following factors: 1) the individual's daily activities; 2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. §§ 404.1529(c) and 416.929(c); SSR 96-7p.

Where the medical evidence is consistent, and supports plaintiff's complaints of the existence and severity of pain, the ALJ may not discredit plaintiff's testimony and deny benefits. *King v. Heckler*, 742 F.2d 968, 975 (6th Cir. 1984). Where, however, the medical evidence conflicts, and there is substantial evidence supporting and opposing a finding of disability, the Commissioner's resolution of the conflict will not be disturbed by the Court. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983) (per curiam). In either event, the ALJ must articulate, on the record, his evaluation of the evidence and how it relates to the factors listed above. *Felisky*, 35 F.3d at 1039-41.

Here, the ALJ provided the following rationale for discounting plaintiff's credibility:

> The [plaintiff] was not a fully credible witness. Her allegations about the nature and frequency of her headaches have not been entirely consistent throughout the record, particularly with respect to her headaches as she experienced them during the time period under consideration. As noted by the District Court, she completed a headache calendar from March 1996 through September 1997 listing headaches of significant intensity and frequency. No such calendar has been completed for the time period between January 1, 1998, and September 30, 2000. Moreover, the minimal treatment record available from Dr. Alter beginning in November 1998 consists of office notes that give very little description of the nature, frequency, and severity of the claimant's headaches. Nothing in the treatment record or in the claimant's written statements supports the claimant's current testimony that at that time she was having virtually uncontrollable headaches . . . . The claimant's testimony for the time period under consideration is therefore credited only to the extent that it was consistent with the determination made above concerning her residual functional capacity level at that time.

(Tr. 623) (internal citations omitted).

The ALJ also noted that when plaintiff was hospitalized in October 2001 treatment plaintiff reported that her past migraines "had been well controlled." (Tr. 623) (citing Tr. 139).

25

Further, the ALJ cited to Dr. Leonard's report to Dr. Alter that 95% of plaintiff's migraine headaches, if treated aggressively and early with medication, resolved within 1.5 to 2 hours. And that only when plaintiff's headaches are not properly treated do they last the entire day. *Id.* (citing to Tr. 156). Lastly, the ALJ cited to plaintiff's statement in January 2003 that she was able to control her migraines with prescription medication. *Id.* (citing to Tr. 334). The ALJ found that this evidence subtracted significantly from plaintiff's credibility.

Plaintiff argues that the ALJ erred in discounting plaintiff's credibility because the length or plaintiff's medical treatment for migraines, as well as the documented history of plaintiff's associated pain, supports her testimony that she suffers from severe and incapacitating headaches. In response, the Commissioner asserts that the lack of treatment from 1998 and beyond supports the ALJ's credibility determination.

In *Couch I*, the district court held that the previous ALJ, ALJ Jordan, erred in discounting plaintiff's statements largely based on the existence of a diary plaintiff kept at the direction of her doctor documenting the frequency and severity of her headaches. ALJ Jordan discounted plaintiff's credibility based on inconsistencies between her reports of pain and doctor's notes showing her headaches were diminishing in severity. The district court found that although plaintiff was experiencing some improvement in the severity of her headaches as noted by Dr. Martin, her statements that she was still experiencing severe and incapacitating headaches was supported by the headache diary.

Here, ALJ Smith noted that unlike *Couch I* "nothing in the treatment record or in the claimant's written statements supports the claimant's current testimony that [during the time in

26

question] she was having virtually uncontrollable headaches consisting of three types, including a debilitating type that lasted anywhere from two hours to several days and on average would last three to four hours." (Tr. 623). However, as discussed *supra*, the lack of medical treatment for the period in question was explained by plaintiff's pregnancy. Further, the record as a whole supports plaintiff's testimony as to the debilitating effects of her headaches.

Plaintiff began treatment for headaches in 1992. She has seen numerous physicians and received a myriad of treatments, from trigger injections to enrolling in a "headache school" in an attempt to control her headache pain. (Tr. 634-39). Aside from infrequent periods of non-treatment due to pregnancy, the record demonstrates that for nearly two decades plaintiff has diligently searched for a treatment or medication that would provide lasting relief from her migraine headaches. Despite these efforts, plaintiff testified that she continues to suffer from severe headaches, even though she has temporarily experienced positive responses to certain treatments or medications.

Plaintiff's testimony here mirrors that in *Couch I*. In both cases, plaintiff testified that: she has three types of headaches, one of which is severe and incapacitating (Tr. 592, 955-58); the severe headaches last anywhere from a number of hour to several days (Tr. 593, 957); when she experiences a severe headache she lays in bed and is unable to do anything (Tr. 593, 956-57); and she was experiencing severe migraine headaches several times a week. (Tr. 597, 957). The ALJ determined that this testimony, which was previously given credence by the district court, is no longer credible simply because plaintiff did not have a diary to supplement her statements. This position is untenable.

27

The medical evidence of record supports plaintiff's testimony that she historically experiences debilitating headaches. The brief gaps in plaintiff's medical records documenting the severity of her pain are book-ended by extensive records of a variety of treatments, therapies, and medications all aimed at reducing the severity and frequency of the migraine headaches. Further, plaintiff's extensive history of seeking treatment for severe migraine headaches supports a finding that her testimony is credible. *See* SSR 96-7p ("In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed *lends support to an individual's allegations of intense and persistent pain. . . .*") (emphasis added).

The medical evidence consistently identifies that plaintiff experiences debilitating headaches and support's plaintiff's statements; accordingly, the ALJ erred by discrediting plaintiff's testimony. *King*, 742 F.2d at 975. The ALJ improperly relied on gaps in plaintiff's treatment to justify discounting plaintiff's credibility without addressing plaintiff's supported testimony that she did not seek treatment while she was pregnant. Further, the ALJ's determination that plaintiff's credibility was undermined by her statements that she could control her migraines with medication completely ignores that by "control" plaintiff was referring to her usual ability to cope with the debilitating pain for a period of hours or days, but that when the pain lasts longer, *i.e.* ten days, she becomes emotional and unstable due to the unrelenting pain and is taken to the hospital by her husband. (Tr. 947-49). Further, the ALJ failed to address plaintiff's testimony that she is generally able to get similar relief from her medications at home as she gets from the hospital, but without spending several hundred dollars, which reasonably

explains why each instance of severe headache is not documented by an emergency room visit. (Tr. 947-48).

Lastly, the ALJ's credibility finding is deficient as she failed to address plaintiff's daily activities, the treatment she receives, or the medication she takes to treat her headaches as required by 20 C.F.R. § 404.1529(c) and Social Security Ruling 96-7p. At no point in her decision did the ALJ address plaintiff's daily activities except to improperly assume that plaintiff's headaches "allowed her to perform her normal functions of daily living." (Tr. 622). "An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Cole v. Astrue*, __ F.3d __, 2011 WL 5456617, at *3 (6th Cir. Sept. 22, 2011) (citing *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009)). Accordingly, the ALJ's credibility determination is not supported by substantial evidence.

**E. This matter should be reversed and remanded for an award of benefits.**

This matter should be remanded for an award of benefits. "[A]ll essential factual issues have been resolved and the record adequately establishes . . . plaintiff's entitlement to benefits." *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Commissioner has failed to meet his burden of proof showing medical improvement following the award of benefits for a closed period and the record evidence establishes that plaintiff's migraine headaches continue to be debilitating and preclude substantial gainful activity after December 31, 1997. Thus, the proof of disability is strong and

29

opposing evidence is lacking in substance.  A remand in this matter would merely involve the

presentation of cumulative evidence and would serve no useful purpose.  *Faucher*, 17 F.3d at

176.  *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771

F.2d 966, 973 (6th Cir. 1985).  Accordingly, this matter should be remanded for an award of

benefits.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **REVERSED** pursuant to Sentence Four of 42

U.S.C. § 405(g) consistent with this opinion and remanded for an award of benefits.

Date: 2/7/2012

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

LAURA COUCH,
    Plaintiff

vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:11-cv-174
Spiegel, J.
Litkovitz, M.J.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

31